The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and His Honorable Court. Please be seated, ladies and gentlemen. Good morning. Good morning, Your Honor. Good morning, Your Honor. We have six cases on our calendar this morning. Four patent cases, three of them from the PTO, one from the district court. We have a government employee case from the Merit Systems Protection Board and a case from the Veterans Court. The Veterans case and one of the PTO cases are being submitted on the briefs and will not be argued. And our first case is Forest Laboratories v. Teva Pharmaceuticals, 2016, 2550 and 2553. Mr. Pappas. Thank you, Your Honor. Good morning. May it please the Court. This case presents a single narrow issue. That is, whether the 50 percent limitation of Claim 1 of the 209 patent is indefinite. Before beginning my argument, I'd like to make two points to outline for the Court where I intend to proceed to address the merits. First, Claim 1 we submit is not indefinite because the district court misconstrued Claim 1. And under the proper construction, a POSA would readily understand the scope of the claim. Second. Mr. Pappas, don't you have a more serious problem of indefiniteness? This is a claim to a composition of an extended release formulation providing a concentration profile. And you're talking about how to measure it. This is an empty claim. It doesn't tell you what it is that is necessary to produce this sustained release and to get this result. It claims all ways of getting this result. Now, you know this patent inside and out. When you look at Claim 7 and 9, it starts to tell you what it is. It gives you definite ways of achieving the results. And when you go to the examples, Example 12, for example, is entitled Preparation of Mimantine Controlled Release Formulation. So Claim 1 is why isn't it dead in the water? Because it is indefinite and doesn't tell you how to get to the claimed result. Your Honor, I would respectfully say that I think it does tell the person of ordinary skill in the art how to get to the result because basically what Claim 1 covers is a relative measurement between the IR plasma profile and the extended release plasma profile. But what is in there that gives you that profile aside from how you measure it? And, Your Honor, first of all, with respect to the extended release, it's our position that any POSA would know how to conduct a human trial of the extended release profile. And candidly, that was not presented by the court. But what do you put in the composition that makes the claim definite? It's missing. There's nothing there. Well, Your Honor, we would say it's definite because it also tells you what you compare it to. Once you conduct the human trial with a single dose of the extended release, it gives you certainty by indicating to you, because it's the only comparator in the claim, is you use Figure 1A as replicated in Figure 2D. And if Your Honor will note, on page 5 of our brief, there is a picture of Figure 1A. And we've highlighted in red what is the comparator. And that is what the patentee chose to be the comparator against which you could measure the results of any extended release human trial. And, again, as I said, it's a relative measurement as to whether or not the extended release is 50 percent less. This claim isn't about measurements. The claim is about a composition. Well, Your Honor, I think the essence of Claim 1 is about the measurements. It basically reads a solid pharmaceutical composition comprising an extended release formulation. But go ahead. Of 5 to 50 milligrams memantine, wherein the administration of the dose provides a plasma concentration profile as measured in a single-dose human PK study. And we say once that's done, it's measured against the IR graph. And I might say, Your Honor. How do you get that out of Figure 1? And was it 1A and 2D, the same thing? When in those figures, let's call them both of the comparators, that is the IR and the ER are just computer-generated? Well, Your Honor, first of all, Figure 1A gives you the IR profile. It also gives you the ER profile. The ER profile you generate based on a human PK study. That's what the claim provides. But Figure 1 is an illustration of a comparison between two computer-generated profiles, right? Yes, Your Honor. But they're based on human data. I'm sorry. I don't know what it means by human data computer-generated. They're both human-generated profiles, and this is illustrating a theoretical example of what these concentration profiles might look like, in which, as it happens, at the Tmax, the concentration is twice, is double in the immediate release from what it is in the extended release, because all the DCDT just washes out. You're just comparing concentrations. So I want to follow your question, Your Honor. Your entire argument is that a figure that shows two computer things teaches that when, as you agree, the claim requires one of them has to be human, the other one stays computer. Correct, Your Honor, because that's what the inventors chose to use. What language in the specs says that even when as required, undisputedly, the ER profile is measured in a human study, that the comparator is still a computer model? Your Honor, our answer to that is the specification in its entirety teaches that because it's the only comparator that the patentee points to, and that's the purpose of figures 1A and 2D. To hold otherwise, we submit respectfully would read 1A and 2D out of the claims. They would have no meaning at all. That's what they teach, the skilled artists, is to compare the human trial to the comparator, which is 1A and 1B. I would add, Your Honor, that the information that is contained in 1A and 2D comes from the Gastro Plus program, which, as the record will show, simulates the actual behavior of the drugs in individuals, and it's been used by the FDA Office of Generic Drugs to predict what will take place. That's the comparator that the patentee chose. Our point is whether or not all skilled artisans would have chosen to compare, as the claim requires, the human profile from the ER to the individual profile that's in 1A and 2D, which ended up being a form of a standard, is what the inventor discloses. Aside from any qualitative judgment, that's what the inventors chose, and therefore we contend it's not indefinite. One may not have found the same solution that the inventor found, but as we know, the test for indefiniteness is whether or not, to reasonable certainty, the POSA, the person of ordinary skill in the art, can discriminate the scope of the claim. Your Honor, what's the input data that was used? And point to the specification for the input data that was used in order to formulate or to get those computer formulations that you have. Your Honor, the specific input data for the figures 1A and 2D, the underlying data, is not in the specification. However, GASTRO Plus, in the discussion... So there's no input data in the specification that shows how those computer simulations were achieved? Your Honor, there is, and it also is supplemented by the Pauli Declaration. The GASTRO Plus computer simulation is well known in the art. Any POSA would have known how it was generated. The FDA uses it as their way to predict how a drug will behave. What's the input data that a POSETA would use in order to achieve, to make the comparison with the computer simulations? Well, he would know, or she or she would know, that how GASTRO Plus works, because it's a well-recognized tool, and you get the figure 1A, which is the IR curve, and what it actually gives the POSA is something very concrete and firm, not subject to many of the variables that I expect my opposing counsel will talk about. It gives you figure 1A, gives you that, and you get... I guess that's what I'm looking at too, the human variables. How are they accounted for? Well, they're accounted for in effect because, first of all, you get all the human data from the ER, but in the IR, it's accounted for because all of the human data that has been fed into GASTRO Plus to generate, in this case, the immediate release curve, has been derived from human data, and there has been found by the FDA to be an excellent predictor. And so what I'm attempting to make in terms of a point is it actually gives the POSA some comfort in terms of definiteness. They know exactly where to go with the results of the extended release formulation. You look at 1A, you know what the Tmax is, half of that gets you your 50% line, and then you can determine whether the ER formulation is above or below that line. But I must say, Your Honor, we have two arguments, and it's important for me to address as I see my time going, the alternative argument. That is that... Didn't you waive the alternative argument quite expressly below? You said to Judge Stark that if you're going to start looking at human study versus human study, that Teva is wrong in suggesting as an alternative that the IR and the ER have to be assessed in the same human study. We had a difference of opinion below, Your Honor, that's correct. A gentle way of making the point that you argued against. We had a difference of opinion. However, the court, the district court, had that construction before them. Right, but how can you rely on that here when you specifically said that would be quite an incorrect claim construction? Because what we're here to do, Your Honor, is address the question of indefiniteness. Right, but the indefiniteness is dependent on either if you can't construe it, which is not this case, or on the adoption of the correct claim construction and then assessing whether under that claim construction the ordinary skilled artisan would know whether a given thing was inside or out with reasonable certainty. Correct, and what we're saying is both constructions were before the court. We've briefed it. I would suggest that the waiver doctrine, as I understand it, that often the Court of Appeals applies, is resistance to a claim construction that's offered for the first time on appeal and was not there to be considered by the district court. So we contend that error was committed in two ways. One, we believe the district court should have adopted our claim construction in using 1A as replicated in 2D for purposes of the comparison, and it's not indefinite. You're well into your rebuttal time. You can continue or save it. I will save it, Your Honor, and I'll address more about the alternative argument on my rebuttal. Mr. Schumer. Thank you, Your Honor. Good morning. May it please the Court. This is a case where the district court correctly interpreted the claim. The claim was subject to amenable to construction. He construed it. It was proper. And then he applied factual findings to the two expert reports that were before him. He made factual findings, including credibility determinations, and he concluded that the patent was indefinite. In fact, the whole family of patents, the five patents, were indefinite. There's been no clear error shown in those factual findings by the appellee, and this Court should affirm the district court below. Can I talk to you about what is Mr. Pappas' alternative argument? Of course, Your Honor. That you did say to the district court, we think the right claim construction here is any old ER human study and any old IR human study, and under that construction this is so wildly variable it's indefinite. And that, as I understand it, is what Judge Stark concluded, that, A, that's the right construction, and, B, that under that construction it's indefinite. But then you said, in the alternative, construe the claim to require both the ER and the IR to be evaluated in the same human study, and one of the things that your expert says is any skilled artisan would know you had to do that, because you can't mix and match studies. So why is that your alternative construction, not the right construction? Okay. So when we know… Is that issue waived? It is certainly waived. Where in your red brief did you say they waived this and they can't raise it? And I can't point to a page number, Your Honor, but let me see. We had a footnote that had the Sage Products case and the key pharmaceutical case and the Finnegan case, so that would be, I believe, where it is, Your Honor, because that's the waiver. Footnotes don't constitute arguments. Excuse me, Your Honor. Pardon me, Your Honor. I think the footnote accompanied text, I'd have to find it, but it is clearly a waiver argument, as you suggest. Why we can raise it, as an appellate standpoint, as the appellee, I can raise any standard or argument that supports the judgment. That's just the way appellees work. On the appellant side, though, you do have a waiver if you are making that argument and you're changing positions on appeal. But let me answer you substantially because I think it's more important to understand what happened. When we narrowed our claim interpretation, we did not say that that claim interpretation would render the claim indefinite. No, but my understanding is that the question of indefiniteness, if the claim is construed to require both ER and IR to be evaluated in the same human study, simply has not been decided. I believe it has, Your Honor, and here's why. Because when we narrowed our definition down, well, let's take a step back. Our expert said that there's variability between studies. So there's variability between study A and study Z, and that was the basis of our primary claim interpretation argument. He said if you narrow it down to using the same human study, you will minimize, and he used the word minimize, some of the problems. He didn't say he would eliminate them. No, I don't read what he said as a concession of definiteness, but I also don't read the district court as having found that if you take that approach, it would be indefinite. I take it this to be, I guess I understood that this issue really has not been litigated because the claim construction that it depends on is one that Forrest said was wrong, and Judge Stark seems to have agreed with that. I think Judge Stark's findings were broad enough to cover the alternative interpretation. Appendix page 36 and 37, I believe it is, or is it 37 or 38? Let me find it. It's 37 bridging onto 38 because the judge, even if you use the same human studies, the same human study for two IR and ER formulations, you still have the possibility that one skilled in the art could pick any number of study designs. So you could still have a study A and a study Z. They would just be with the same humans now or the same conditions. But they're still different tests. And if you look at the findings of fact that the judge made down below, he still credited our expert, Dr. Bergstrom, with the fact that even in an appropriately designed study, and he put it in parentheses, even in an appropriately designed study, which is what we're talking about here, you would still have variation between study designs. And he rendered the claims indefinite. So Mr. Pappas said in his gray brief that the variation that that testimony refers to was not a variation in the relative numbers, that is, between the ER and IR, but more or less full stop. There may have been testimony about variation in what ERs you would get and maybe what IRs you would get, but that the testimony did not reach the ratio, which is the only thing the claim is concerned with. Well, that's not true. The claim is concerned with the ratio, but indefinite is concerned with whether you'll get a different result with that ratio between tests. So one skilled in the art could pick test A and run it and eliminate or minimize, as our expert said, some of the variables there. But then you could run test Z as well and minimize the variables there, but you still have variation between these two tests or between test G or H or X, Y, Z. And that was the point of the district court's finding on the first claim interpretation, and it doesn't change with the alternative claim interpretation. You still have that inter-variability. Does a gastro plus software that's used in the computer simulations, does that account for the variations you're talking about? No. In fact, if you look at Dr. Bergstrom's opinion, declaration at appendix page 662, at paragraph 101, he talks about all of the various things that you have to put into gastro plus. He says you need to have dissolution, pH, population characteristics, age, sex, weight, health history, diet condition, fasted versus fed. All of these things need to be put in. These are all different ways you can design a study. I could design study A that's adults that are fed, or I could design study Z that are pediatrics and unfed. And I can mix and match these variables, and that's what the gravamen of the opinion was, is that you can design all of these studies. The patent doesn't tell you which one to design. You can design all these studies, and when you do that, you're going to get variations among those studies that allow you to say, well, sometimes it will infringe and sometimes it doesn't. And Bergstrom, Dr. Bergstrom gave a specific concrete example of that in his declaration. So the district court's findings extend beyond the initial claim interpretation that he made. If you choose that there's not a waiver and you choose this alternative interpretation, the district court's findings still are not clearly erroneous and render the claim indefinite. So you would have to affirm, in my opinion, regardless. But I do believe there's a waiver, Your Honor. I do believe you cannot, in all fairness to a district court judge, make an argument and then win on it, which is what happened here, and then come up on appeal and say it's legalized. They didn't win. They're the appellant. Well, they won on that issue. They lost their patent. They won on that issue, and estoppel goes by issue. And it did them no good. But this court talks about getting a second bite at the apple, which is what this doctrine is supposed to prevent. And this is what they're doing on appeal, trying to get a second bite at the apple. Even though what they're now doing is saying, you know, on second thought Teva was right about this point. Well, it would have been nice to litigate that below. I'm not quite sure who lacks, you know, standing to be assertive. I mean, you're each kind of arguing now against exactly what you argued below. Except that as an appellee, as your honors are aware, I am allowed to support the judgment with any arguments, whether they contradicted me or not, because that is the judicial process for trying to give certainty to what's happening at the district court and to respect the process. So appellees and appellants are, I think, situated differently in this issue of estoppel, and I think the cases show that. Can I ask you one highly technical question? There's this old 709 patent that was originally in the 121 action, and yet I don't see a judgment about that patent. How did it disappear from the case? I'm kind of guessing it expired and somehow you all agreed to remove it. But finality of all the claims in the case is rather important to our jurisdiction. I don't know what happened to the 709 patent. Is it in the list? It's not in the list. It's in one of the two complaints, the 121 case. The 121 being one of the two district court docket numbers. I see. Did the district court sweep it into its claim interpretation? We shouldn't be taking up time on this. I thought you would have a very simple answer about why we have a final judgment in front of us. Counselor, the record does contain a sole single-dose human PK study, and that's in the prosecution history. Why isn't that enough to support the figures 1A and 2D? It's not, because if you look at that declaration. This is the Wendt declaration? The Wendt declaration. He lists that data and then in a parenthetical, he says that it's consistent with the lamendal label. Let me see if I can find it here. It's at appendix page 472. Dr. Wendt, when he's describing what's covered by his claims, does not give the human data and then say it's consistent with the computer-generated data in the patent. He says, here's my human data, and it's consistent with more human data that's found in the lamendal label. I think that the computer data in the patent is one of these vestiges of disclosed but not claimed. Oftentimes in patents, you put data in there thinking you might claim it sometime, but you don't. The claims clearly contemplate human data, not computer data. It wasn't claimed. It was disclosed clearly in the patent but not claimed. I think the simple answer is why it's there. It's one of those vestiges of things that are dedicated to the public because they were disclosed but not claimed. Data are dedicated to the public? Well, information can be dedicated. It's just a composition. Yeah, I do agree. I had not thought about that, but it is a composition claim, and there's no structure. The only thing that's described is the memantine, which is the active ingredient which does not provide the extended release. So, yes, this is an empty claim. It has no structure, and it wasn't decided below, but certainly I agree with Your Honor. Was it argued below? No. You focused just on the indefiniteness of essentially the functional. Language, yeah. That's correct, Your Honor. That's correct. So, in conclusion, Your Honors, if you have no further questions, as I said, this is a case where the claimed construction is amenable to construction. The district court found a proper construction, looked at the evidence in this case, weighed and balanced the declarations of the experts, and came to the conclusion, even making credibility findings, that one expert was more credible than the other and concluded the patent was indefinite. This panel should affirm that decision. Thank you. Thank you, Mr. Shuman. The office will give you your three minutes of rebuttal. Thank you, Your Honor. Do you have any enlightenment? I should have said the 703 patent, I think, not the 709. Do you know what happened to that? We're checking on that now, Your Honor. Let me say, first of all, on the continued argument on our alternate construction, and I want to address, Judge Rainey, your question as well. Simply put, a fair reading of Judge Stark's opinion, he did not decide this issue. When you read through that portion of his opinion, when he got to this claim limitation, he basically focused, it says, human trial, everything has to be a human trial, and that was the end of the analysis. There's no evidence that we can find in the record that he actually considered the alternate construction, but nevertheless, it was before him and has reread the waiver cases that was not in any sense waived. Our argument then, as it is in what it is today, is we believe our primary position is correct, but if not, this court, we believe, is to decide whether or not this claim is indefinite, and if you adopt the alternate construction, which is that the IR profile and the ER profile are produced in the same study, then all the variability is gone. And, Judge Toronto, to your questions, I think we need to point to certain sections of the declaration. Bergstrom? Bergstrom. Specifically, on Appendix 663, he says that, I'm sorry, 671, he says, because different PK studies with different subjects will generally provide different Tmax and Cmax values, the only way to reliably determine whether an ER memantine composition is less than 50 percent of the IR is to use the same study. He tells us it's the same study. And in Appendix 640, he says by putting them in the same study, it minimizes the impact of any differences, and therefore, you get an accurate test of the formulations. Finally, on Appendix 667, Tevas gave their alternate claim construction, and Bergstrom says the only reasonable construction of this limitation is that the plasma concentration of both dosage forms, ER and IR, must be measured in the same study. And in their brief, they gave this as an alternative. They proposed that in the district court as an alternative construction. I don't read this crucial, I guess, was it paragraph 119 on page 671, as going beyond saying to get a reliable number for a particular study comparison, you have to put them in the same study. I don't read that as conceding that if you did studies 1 through 15, each one with ER and IR in each one, that you would get, in fact, a reliably stable ratio across all of those studies. What I'm not sure about is whether this issue has actually been litigated. I don't think it's been conceded. And that's the point on which I'd like to conclude that comment, is that that's simply the district court did not consider that alternate construction. So it hasn't been litigated. And that's why we suggest and ask for, if not an outright reversal, then a remand to give the chief judge a chance to consider a very important question, which is if you adopted the construction urged by Tebbe, would it be indefinite? I'm confident that he would reach the conclusion that it's not indefinite. But while he had the construction performed, he didn't rule on it. His opinion doesn't address it. And I think, candidly, that's what remand is often for. Thank you, Mr. Pappas. Pardon me? I think your time has been exceeded. Exceeded. We will take the case under advisement. Thank you.